Filed 2/25/16  P. v. Gammage CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>TED W. GAMMAGE and<br>ISIAH MATTHEW SHELBY,<br><br>   Defendants and Appellants. | B256154<br><br>(Los Angeles County<br> Super. Ct. No. MA059862) |
| In re TED W. GAMMAGE<br><br>   On Habeas Corpus. | B267058<br><br>(Los Angeles County<br> Super. Ct. No. MA059862) |

APPEAL from judgments of the Superior Court of Los Angeles County, John Murphy, Judge.  Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Ted W. Gammage.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Isiah M. Shelby.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Ted W. Gammage and Isiah Matthew Shelby appeal from their convictions of one count each of second degree robbery. They argue that prosecutorial misconduct requires reversal because the prosecutor violated *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*) by alluding during closing argument to appellant Shelby's failure to testify, and by employing the prestige of his office to buttress the credibility of an unreliable witness. Appellants also contend the trial court abused its discretion in admitting evidence of a prior crime committed by appellant Shelby to prove identity. We conclude that none if these contentions has merit, and affirm.

## BACKGROUND

A jury convicted appellants Gammage and Shelby of one count each of second degree robbery. (Pen. Code, § 211.)[1] Appellant Shelby was also convicted of personally using a deadly and dangerous weapon. (§ 12022, subd. (b)(1).)

*Prosecution Case*

*Appellant Shelby Robs the Recycling Center*

At 11:00 a.m. on April 12, 2013, Armando Reyes was working at a recycling center housed in a shipping container next to a gas station in Lancaster. An African-American man, about five foot eight, with "Bob Marley type hair"—later identified as appellant Shelby—arrived to exchange some recyclable items for cash. Reyes weighed appellant Shelby's materials and paid him from money from a cash box kept inside the recycling center. Appellant Shelby did not leave after receiving his payment. Instead, appellant Shelby borrowed a phone from Jerome

---

[1]     Except where otherwise noted, statutory references are to the Penal Code.

2

Washington, the next customer in line, placed a call to a phone number belonging to his brother, Trevor Shelby, and returned the phone to Washington.

While Reyes was inside the container retrieving cash to pay Washington, he felt someone approach from behind. He turned and saw appellant Shelby, who had a knife pointed at Reyes' chest and said, "Give me the money." Reyes gave him the contents of the cash box (about $70). Appellant Shelby then grabbed Reyes' cell phone, which was beside the cash box, and ran off.

Reyes emerged from the container and announced to his customers that he had been robbed. Michael Franklin, a friend who had accompanied Washington to the recycling center, chased after appellant Shelby but was unable to catch or later identify him. Washington called 911.

Eleven days after the robbery, Washington selected a photo of appellant Shelby from a photographic six-pack shown to him by the police, initialed the photograph and wrote, "Seen this man running away from the man I know he robbed." Reyes viewed video footage obtained from security cameras at the gas station near the recycling center. That footage depicted a Black man running away from the recycling center with two men in pursuit. Reyes identified the man running away as the person who robbed him, and recalled having seen him at the recycling center several times before the robbery. At trial, Reyes did not identify either appellant as the robber.

*Appellant Gammage Acts as Getaway Driver*

Arturo Montesdeoca lives across the street from the recycling center. While driving to his home at about 11:00 a.m. on April 12, 2013, Montesdeoca saw a man—whom he later identified as appellant Gammage—on a transformer box. The man wore jeans, a T-shirt and a beanie. Montesdeoca was "very suspicious" of the man (who could easily have jumped from the transformer into

3

Montesdeoca's daughter's yard). He slowed his car, rolled down the window and made eye contact with appellant Gammage who was "no more than 20 feet away." He "looked directly at [the man] just so he [would] notice that [Montesdeoca] did look at him." Montesdeoca parked nearby and continued watching the man. While doing so Montesdeoca noticed an unfamiliar blue or green late model car—later identified as belonging to appellant Gammage—that seemed out of place, parked across from his own house. Montesdeoca saw the man on the transformer run to the car, followed by a "black person, really tall," who jumped into the front passenger seat as appellant Gammage drove off.

A few hours after the robbery, Montesdeoca told police the man on the transformer had been about five feet, eight inches tall, weighed 200 pounds, and had hair cut very short on the sides under his beanie. He described the car as a "smaller green or blue metallic, older car." Montesdeoca had not seen the license plate and did not identify the car's make or model, but testified at trial that "it might have been an older, later Honda or something like that." He later selected appellant Gammage's picture from a six-pack photo array as the person he had seen on the transformer, and agreed that the single photo of a car the police showed him depicted the car he had seen on April 12. Montesdeoca identified both appellant Gammage and his car at trial. Montesdeoca testified that the man he saw on the transformer had been "stocky," but agreed that appellant Gammage—who is at least six feet, three inches tall and weighs 150 to 160 pounds—was "skinny." Montesdeoca explained that he may have believed the person he saw was heavy set because of a jacket or sweater he wore, but acknowledged that the man on the transformer was wearing a T-shirt.

4

*The Police Investigation*

On May 28, 2013, officers spoke (and recorded the interview) with appellant Shelby in front of the sheriff's station in Lancaster after he had been arrested, and had posted bond and been released from custody. Beatrice Shelby, appellant Shelby's grandmother, was present at the interview, parts of which were played for the jury. During the interview, appellant Shelby denied any role in the crime, and claimed to have receipts and other records to document his activities on April 12, 2013. He never produced those records. Appellant Shelby also told the officers he had not been to Lancaster since Valentine's Day. He claimed he was "in Calabasas . . . playing basketball" on the day of the robbery. Appellant Shelby also told a third officer that he had not been to the Lancaster area recently, even though that officer had spoken with appellant Shelby in Antelope Valley for about two hours on March 28, 2013.

*Defense Case*

Appellant Gammage presented records showing that, on the morning of April 12, 2013, he sold blood to Octapharma Plasma in Van Nuys. His appointment had been scheduled for 8:15 a.m. At 10:22 a.m., Octapharma made an electronic deposit to appellant Gammage's bank account.

Between 11:00 and 11:30 a.m. on April 12, 2013, appellant Shelby's grandmother, who lives in Panorama City, received a phone call from her grandson asking her to meet him at the locked gate to her apartment complex. From the gate, Beatrice Shelby saw both defendants. Appellant Gammage was sitting in appellant Shelby's car. When interviewed by officers on May 28, Beatrice Shelby did not mention having seen her grandson or appellant Gammage on April 12, 2013.

5

One of appellants' co-workers (all three work for the same employer), testified that both appellants were on the company's basketball team. From mid-March to mid-April, the team practiced for a tournament that began on April 13, 2013. Typically, practice sessions began between 2:00 and 6:00 p.m. and appellants attended most practice sessions. The co-worker testified that appellant Gammage's regular work shift begins by 3:30 p.m. The co-worker had no knowledge about appellant Shelby's work schedule.

Appellant Gammage testified that he lives in North Hollywood, and works at the Cheesecake Factory facility in Calabasas, Monday through Friday, 3:30 p.m. to 12:00 a.m. On April 11, 2013, appellant Shelby spent the night at appellant Gammage's house. The next morning both appellants went to Octapharma to sell blood, but appellant Shelby was unable to do so. Afterwards, they went to Beatrice Shelby's apartment building, stopped at a cigar store, went back to appellant Gammage's house and later drove together to work. Appellant Gammage was working at about 4:30 p.m., when he clocked out for basketball practice. He clocked back in at 6:15 p.m. Appellant Shelby was with him.

When arrested while driving in his car with appellant Shelby on April 27, 2013, appellant Gammage told officers he had not been in Lancaster since December 2012. Appellant Gammage testified that the car depicted in the photograph shown to Montesdeoca was his, a green 1998 Toyota Corolla.

An eyewitness identification expert testified about various factors that can affect memory and, in turn, the accuracy of a witness' identification.

Appellant Shelby did not testify or present any evidence.

**DISCUSSION**

Appellants maintain that: (1) they received ineffective assistance of counsel when neither of their trial attorneys posed an objection to a *Griffin* violation made

6

by the prosecutor during closing argument regarding appellant Shelby's defense; (2) the prosecutor committed prosecutorial misconduct by using the prestige of his office to bolster a witness' credibility; (3) the trial court erred in admitting evidence of appellant Shelby's prior conviction for grand theft to show identity; and (4) the cumulative effect of the other errors rendered his trial fundamentally unfair.

1.      *No Prosecutorial Misconduct/Griffin Error*

During rebuttal argument, the prosecutor reminded the jury that the charges against each defendant had to be decided separately; they could not "be lumped together."  As to appellant Shelby, the jury had to determine whether he committed the robbery and, if so, whether he used a knife during the crime.  As to appellant Gammage, the jury had to decide whether he aided and abetted appellant Shelby, the robber.  The prosecutor stated:

> "But I want to talk to you for a minute, because, like I told you in my first argument, it's important to keep [appellants] separate.  If there are some of you here who are thinking about buying into [appellant] Gammage's alibi, I think we should also consider the possibility that he's covering for [appellant] Shelby.  If, for some reason, you are buying into his alibi, I think it's important to question whether or not [appellant] Shelby was really with him.  *Because [appellant] Shelby has provided absolutely nothing to say where he was at the time.*  So if you believe Ted Gammage about his alibi, you do not have to believe him about [appellant] Shelby. And you can think about [appellant] Shelby separately.  And that's what I want to leave you with." (Italics added.)

Neither defendant's attorney objected to this allegedly improper comment, nor did counsel request that the court admonish or instruct the jury that appellant Shelby had a right not to testify, and that jurors could not infer evidence of guilt because he had invoked that right.  Conceding that his counsel's failure timely to

7

object ordinarily constitutes forfeiture of this contention on appeal, appellant Gammage—joined by appellant Shelby—asserts that he received ineffective assistance of counsel by virtue of his attorney's failure to object to what he insists was an "obvious violation" of *Griffin*. We find that no *Griffin* error occurred, rendering moot the argument regarding ineffective assistance of counsel.

In *Griffin,* the United States Supreme Court held that comment on a defendant's failure to testify may violate his or her Fifth Amendment right not to be compelled to testify at trial. (*Griffin, supra*, 380 U.S. at p. 615.) The prosecution may not comment "directly or indirectly on an accused's invocation of the constitutional right to silence." (*People v. Lewis* (2001) 25 Cal.4th 610, 670; *People v. Carter* (2005) 36 Cal.4th 1114, 1191.) Nor may a prosecutor refer directly or indirectly to an absence of evidence that could only be provided by a defendant's testimony. (*People v. Hughes* (2002) 27 Cal.4th 287, 372 (*Hughes*).) However, so long as the instructions and argument make it clear that the defendant does not bear the burden of establishing his innocence, a prosecutor's reference to the absence of available exculpatory evidence or the defendant's failure to call logical witnesses, does not constitute *Griffin* error; it is merely fair comment on the state of the evidence. (*Ibid.*; *People v. Brown* (2003) 31 Cal.4th 518, 554 [not improper for prosecutor to direct jurors' attention to the fact that defendant never presented evidence that he was elsewhere when the crime occurred]; *People v. Miller* (1990) 50 Cal.3d 954, 996 [prosecutor may comment on defendant's failure to produce logical witnesses]; *People v. Gaulden* (1974) 36 Cal.App.3d 942, 954 [observation that defendant produced no evidence on his own behalf is not *Griffin*

8

error].)[2] In ascertaining whether *Griffin* error occurred, we must determine if there is a reasonable likelihood jurors could have understood the prosecutor's allegedly improper comment—when viewed in the context of the argument as a whole—as a reference to a defendant's failure to testify. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203 (*Cole*); *People v. Clair* (1992) 2 Cal.4th 629, 663 (*Clair*).)

Here, in the comments that appellants contend constitute indirect comments on appellant Shelby's failure to testify, the prosecutor stated, "If . . . some of you . . . are thinking about buying into [appellant] Gammage's alibi, I think we should also consider the possibility that he's covering for [appellant] Shelby. . . . I think it's important to question whether or not [appellant] Shelby was really with him. Because [appellant] Shelby has provided absolutely nothing to say where he was at the time. So if you believe [appellant] Gammage about his alibi, you do not have to believe him about [appellant] Shelby." These comments were merely an appropriate reminder by the prosecutor that the case against each defendant had to be determined independently, and that the jury was free to find appellant Shelby guilty whether or not it believed his co-defendant's alibi.

---

[2] For example, in *Hughes, supra,* 27 Cal.4th 287, the Court rejected the contention that a prosecutor's rhetorical questions regarding the defense theory—"'Where is there a single piece of evidence that . . . something snapped because [the defendant and victim] were surprised at [seeing] each other . . . ? Where is there evidence of that? Where is there a witness to testify to that? Where is there a piece of physical evidence to suggest that?'"—constituted a *Griffin* violation; the comments were merely "proper fair comment on the state of the evidence." (*Id.* at p. 373, italics omitted.) Similarly, a prosecutor's statements to a jury that "'[no evidence] has been presented to you [by the defense]'" and that "'[a]bsolutely zero [evidence] has been presented to you by [the defendant] and his attorney,'" did not constitute *Griffin* error because neither remark "suggested that defendant had a burden of proof which he failed to carry, and the court's jury instructions confirmed that the People had the entire burden of establishing defendant's guilt." (*People v. Ratliff* (1986) 41 Cal.3d 675, 691.)

9

The prosecutor did not highlight or refer to appellant Shelby's failure to testify; his comments merely referred to an absence of evidence contradicting the prosecution witnesses. The comments also highlighted the fact that appellant Gammage, who presented evidence that he donated blood the morning the crime occurred, as well as time records from his employer and the testimony of a co-worker regarding his work schedule, undertook a substantial effort to present "every bit of information to clear [his] name." In contrast, although appellant Shelby presumably had access to and could have presented similar evidence, he chose not to do so. For example, appellant Gammage testified that appellant Shelby also went with him to sell blood at Octapharma. Appellant Shelby left "to go get some food or something" while waiting for appellant Gammage after appellant Shelby was told "for whatever reason" by Octapharma that he could not give blood himself. However, appellant Shelby presented no evidence to show that he: (1) had been scheduled or applied to donate blood at the same time as appellant Gammage, or that his application was denied; (2) used a credit/debit card to buy food or anything else (or a receipt from a cash purchase) while he waited; (3) made or received phone calls or texts while in Van Nuys; or (4) went to do "something" else while waiting for his friend (e.g., by presenting video footage from a surveillance camera of a nearby business). Thus, unlike appellant Gammage, and apart from the testimony of his friend, no evidence placed appellant Shelby at or near Octapharma on April 12, 2013.

Similarly, like appellant Gammage, appellant Shelby presumably had access to and could have presented timekeeping records from his employer to place him at the jobsite in Calabasas the day of the crime, or could have presented testimony from a co-worker or supervisor about his work schedule. He did not do so. The prosecutor's comments merely highlighted the state of this evidence, leaving the jury reasonably to wonder why appellant Shelby had failed to present

10

documentation and testimony similar to that presented by appellant Gammage when no apparent obstacle prevented him from doing so. Moreover, although one officer testified that appellant Shelby had told him he could provide proof that he was in Calabasas the day of the robbery, no such evidence was provided.

Appellants note that appellant Shelby's grandmother, Beatrice Shelby, testified on behalf of appellant Gammage at trial that she saw both appellants around the time of the robbery, when her grandson called and asked her to meet him at her gate. From this fact, appellants infer that the only thing to which the prosecutor's comments could have referred was appellant Shelby's failure to testify. Not so. Beatrice Shelby testified that she received a call from her grandson on April 12, 2013 between 11:00 and 11:30 a.m. Appellant Shelby presented no phone records reflecting a call made during that time from his own phone to (or received by) his grandmother's phone. As with appellant Shelby's failure to present presumably available documentation of his whereabouts at other points throughout that day, the jury could reasonably have understood the prosecutor to be referring to the absence of this type of evidence.

Finally, appellants complain only about a fleeting, isolated portion of the prosecutor's closing during which he reminded the jury of its duty to reach independent verdicts as to each defendant. Isolated comments do not "comprise[] a pattern of conduct so egregious that it infects '"the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]'" (*People v. Bennett* (2009) 45 Cal.4th 577, 594-595.) An isolated comment such as this does not rise to the level of prosecutorial misconduct warranting reversal. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [no reversal required because prosecutor's comment, while improper, was "brief, mild, and not repeated"].) The prosecutor highlighted significant shortcomings in the defense theory, but did not reiterate the law or jury instructions related to a defendant's decision not to testify. Even if we

11

assume some level of ambiguity in the prosecutor's comments, it did not rise to the level of a deceptive tactic or reprehensible method to obtain a conviction. (*Cole, supra,* 33 Cal.4th at p. 1202 [a prosecutor's misconduct that does not render trial fundamentally unfair, nevertheless "violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade'" the factfinder].) Moreover, we presume the jury relied on the court's instructions regarding the law, not argument by counsel, thus any residual ambiguity was clarified by the instruction that a defendant's decision not to testify may not be considered evidence of guilt. (See *People v. Morales* (2001) 25 Cal.4th 34, 47.)

Prosecutors must walk a fine line in this area. They are free to comment on "the defense's failure to put on exculpatory evidence," but may do so only if "those comments are not aimed at the defendant's failure to testify and are not of such a character that the jury would naturally and necessarily interpret them to be a comment on the failure to testify." (*People v. Guzman* (2000) 80 Cal.App.4th 1282, 1289.) Here, the prosecutor approached but did not cross that line. He reminded the jury that they had been given no information other than the questionable facts attested to by appellant Shelby's grandmother and appellant Gammage. This reminder did not necessarily lead the jury to contemplate holes in the defense case that could only be filled if appellant Shelby testified. We conclude it was not reasonably likely that jurors could *only* have understood the prosecutor's comments as a reference to appellant Shelby's failure to testify. (*Clair, supra*, 2 Cal.4th at p. 663.) As noted above, countervailing defense evidence could have come from other, more reliable sources, including readily obtainable documentation. Viewed "in the context of the argument as a whole," the prosecutor's statements were permissible rebuttal comments on the state of the evidence. (*Cole, supra*, 33 Cal.4th at p. 1203.)

2.    *Prosecutorial Misconduct by Vouching for a Witness' Credibility*

Appellants contend that the prosecutor committed misconduct by impermissibly vouching for the accuracy of Washington's identification of a suspect in an unrelated case, thus employing the prestige of the District Attorney's office to bolster an otherwise weak witness.

a.    *Relevant Proceedings*

Fewer than two weeks after the robbery occurred, police showed Washington a six-pack photo line-up. He circled photograph number five (depicting appellant Shelby), placed his initials below the photo and wrote that the man depicted therein was the same person he saw on April 12, 2013, "running away from the man [Washington knew] he robbed," and to whom Washington had earlier loaned his phone. At trial, when asked if the person who asked to use his phone was in the courtroom, Washington responded that he "[couldn't] honestly say."[3]

During re-cross examination, trial counsel for appellant Gammage raised with Washington the issue of his identification of a suspect in an unrelated action––a case coincidentally being tried at the same time as this one in which Washington was also a witness. Appellant Gammage's attorney elicited evidence that in the other case, Washington had chosen photograph number five from a photo six-pack on October 21, 2013. Nine days later at the preliminary hearing in the other case, when shown the same photo line-up, Washington testified that he had previously selected the wrong photograph, and chose number four instead.

---

[3]    Washington acknowledged having two convictions for possession of narcotics in 2006 and 2008.

13

In the instant case, on re-direct examination by the prosecutor, Washington explained that in the other case, when he initially identified the person in position number five, he had written "that [the person in that photo] looks like the guy." But, by the time of the preliminary hearing, he decided he was wrong and photo number four "looked more like the guy."

In closing argument in the present case, counsel for appellant Gammage addressed Washington's credibility as an eyewitness. He pointed to discrepancies between testimony given by Washington and Reyes and admonished the jury to "think about that" other case. He argued that Washington is the "one person holding [appellant] Shelby here[,] has made this mistake before. You heard him testify that [in the other case] he saw and picked . . . position No. 5. And then when he had the opportunity to look at it again, he said, oh, it's not No. 5. It's person No. 4. And, no, it's not the person I see in court. It's somebody else." The attorney opined that Washington was "an unreliable witness," and that his untrustworthiness "alone creates reasonable doubt."

The prosecutor responded to this assertion during his rebuttal:

"[Defense counsel] also touched on a different case, where Mr. Washington is a witness. You will have the six-pack from that case. Basically, the issue is, in that case, Mr. Washington initially gravitated towards one photograph. And then, later on, he told the detective that he had some second thoughts about that.

"A couple points I want to make about that. First of all, he did not identify the person in that six-pack, not like he did in this case. This case, he circled it, initialed it, wrote it out. In that case, he just said No. 5 kind of looks like the guy.

"Second of all, you heard, because [defense counsel] asked the question, . . . that case is . . . being prosecuted right now. That means that he got the right guy. Even though he had some second thoughts about it, he got the right guy. That case is still being prosecuted."

14

Counsel for appellant Gammage objected that the prosecutor was arguing "facts not in evidence." The objection was overruled.

b. *Forfeiture*

Respondent argues appellants forfeited any due process claim premised on prosecutorial misconduct because the prosecutor's argument was fair rebuttal. Appellants failed specifically to object to the argument on the ground that the prosecutor improperly vouched for Washington's credibility, and failed to seek an jury admonition regarding that misconduct. (See *People v. Williams* (1997) 16 Cal.4th 153, 250 [constitutional objections not raised at trial are not preserved for appeal].)

Appellant Gammage argues no forfeiture occurred because his attorney's objection should have been sustained. He argues the prosecutor did refer to facts not in evidence, namely, an unsupported assumption that the "right guy" was being prosecuted in the other case. He also insists respondent's claim that the prosecutor's argument was fair rebuttal is wrong: the point made by appellant Gammage's counsel in closing argument was that Washington had changed his mind after making an identification and that someone who vacillates on such a pivotal issue is an unreliable eyewitness. The prosecutor's rebuttal did not respond to this argument. Instead, the prosecutor tried to bolster Washington's credibility by claiming he had "got the right guy," an unsupported claim that went beyond the record. By referring to the other ongoing prosecution, the prosecutor implied that Washington had similarly identified the "right guy" here, or the case would not have been tried. Appellant Gammage also argues he had no chance to seek an admonition after his objection was overruled.

Acknowledging that respondent "is generally correct" that forfeiture occurs where no objection or request for admonition is made at trial, appellant Shelby

15

maintains that it would have been futile for his trial counsel to object after the court overruled appellant Gammage's objection. He also argues that an additional objection would have served only to exacerbate (rather than cure) the harm by focusing the jury's attention on the prosecutor's misconduct. (See *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030; *United States v. Grayson* (1948) 166 F.2d 863, 871 (conc. opn. of Frank, J.) [raising an objection to improper testimony or having the judge instruct the jury to ignore it "often serves but to rub it in"].)

### c. *No Prejudicial Misconduct*

We assume, for purpose of discussion, that no forfeiture occurred. We further assume that the prosecutor's comment that Washington "got the right guy" in the other case exceeded the wide latitude permitted for commenting on the evidence in argument. Nevertheless, on this record, we conclude that any error was not prejudicial.

First, as the prosecutor correctly noted, Washington's identification of appellant Shelby from the photo six pack was far more definitive than his assertion in the other case that the person he initially identified "looks like the guy." Thus, Washington's uncertainty in the other case had little bearing on the certainty of his photo identification of appellant Shelby in the present case. Second, the prosecutor's suggestion that the ongoing prosecution in the other case meant that Washington "got the right guy" did not imply that the prosecutor had personal knowledge regarding Washington's credibility or personal knowledge of facts outside the record. Rather, rightly or wrongly, as the prosecutor explained, he made that argument based solely on inference from the evidence elicited by appellant Gammage's counsel that the case was currently being prosecuted. Third, the prosecutor's argument on the point was brief.

16

Fourth, as to appellant Shelby, Washington's identification of him was corroborated by the evidence that the person who took Washington's phone shortly before the robbery called the telephone number of appellant Shelby's brother. That fact has no rational explanation except that appellant Shelby was the man who took Washington's phone – the same man Washington saw rob Reyes. Fifth, appellant Gammage's conviction rested not on Washington's testimony, but on the testimony of Arturo Montesdeoca, who identified appellant Gammage as the getaway driver in a photo six pack and at trial. Thus, it is difficult to see any harm that flowed to appellant Gammage from the prosecutor's assumed objectionable comment about Washington "[getting] the right guy" in the other case.

In sum, under the totality of the circumstances, we find there is no reasonable probability the jury would have reached a different verdict as to either appellant had the prosecutor not made the comment to which appellants' object. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)


3.     *Evidence of Prior Crime to Show Identity*

Appellants contend that the trial court abused its discretion in admitting evidence regarding appellant Shelby's 2010 juvenile adjudication for grand theft in order to establish identity. (Evid. Code, § 1101 [section 1101], subd. (b).) We conclude the court acted within its discretion in admitting evidence of a prior bad act to show that Washington correctly identified appellant Shelby as the robber.


a.     *Background*

In mid-February 2010, appellant Shelby asked to use an individual's cell phone. The person handed the phone to appellant Shelby, who ran off with it. When the victim began chasing appellant Shelby, a man who had accompanied appellant Shelby began punching the victim until a neighbor threatened to call the

17

police. By this point, appellant Shelby "was gone." He was later detained and, in a juvenile adjudication, admitted a petition charging him with grand theft (§ 487, subd. (a).) The prosecution sought to admit evidence of the 2010 theft to prove identity.

Appellant Shelby's counsel objected to admission of evidence of the prior incident arguing, among other things, that it was remote and that its prejudicial impact substantially outweighed its probative value. The trial court found the evidence of the prior crime—which occurred about three years before the crime at issue here—was neither remote nor inadmissible to show identity. The court noted it would give a limiting instruction.

Later, appellant Gammage—joined by appellant Shelby—argued that evidence of the prior act should be excluded because it: (1) was inadmissible character evidence; (2) failed to meet section 1101's requirements for proving identity; and (3) was unduly prejudicial. Again, the court disagreed and admitted the evidence.

Later, as promised, the court instructed the jury that, if it found the prosecution had proved by a preponderance of evidence that appellant Shelby committed the prior offense, it could (but need not) consider that evidence as a factor for a limited purpose. Specifically, in deciding whether appellant Shelby "was the person who committed the robbery alleged in this case," the jury could consider the similarities or dissimilarities between the prior offense and the charged crimes. The jury was further instructed that it could not consider evidence of the uncharged offense for the purpose of concluding appellant Shelby had "a bad character" or a propensity "to commit crime."

In addressing defendants' alibi evidence in his closing argument, the prosecutor argued that evidence of the 2010 crime bolstered Washington's identification of appellant Shelby because it demonstrated "so much similarity

between [the] incidents." He argued that appellant Shelby had essentially "done the exact same thing before," by "work[ing] in concert with another person," approaching "the victim for a seemingly innocent purpose," stealing the same "distinctive" property (the victim's cell phone), and then "tak[ing] off running on foot." The prosecutor argued that the "overwhelming similarity between these two crimes is evidence that . . . Washington was not wrong. What are the odds? If this was just a mistaken I.D., what are the odds that . . . Washington would pick out the one person who has a prior identical crime? Mr. Washington was not mistaken. You know that because [appellant] Shelby has done this before."

b.      *Admission of the Prior Crime Was Not an Abuse of Discretion*

In general, "'[c]haracter evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is . . . inadmissible to prove a person's conduct on a specified occasion. (§ 1101, subd. (a).) Evidence that a person committed a crime . . . may be admitted, however, . . . to prove some other material fact, such as that person's intent or identity. (*Id*., § 1101, subd. (b).) . . .' [Citation.]" (*People v. Leon* (2015) 61 Cal.4th 569, 597 (*Leon*).) To be admissible, the uncharged act must be relevant to prove a fact at issue (Evid. Code, § 210), and its admission must not be unduly prejudicial, confusing, or time consuming (Evid. Code, § 352). (*Id*. at pp. 597–598.) When offered to establish identity, "'"the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.' [Citation.]" (*Id*. at p. 598; *People v. Carter, supra,* 36 Cal.4th at p. 1148 [to establish identity, evidence of an uncharged crime must be distinctive and "highly similar" to the charged offense].) "'"The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature."'" [Citation.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 736, superseded

19

on another ground by *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.) That "signature," however, does not depend on the existence of one or more "unique or nearly unique" common features; "'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' [Citation.]" (*Leon, supra,* 61 Cal.4th at p. 598.)

Trial courts are vested with wide discretion in determining the relevance of evidence. (*People v. Cooper* (1991) 53 Cal.3d 771, 816.) We review the court's ruling on the admissibility of evidence, including evidence of the commission of other crimes, for abuse of discretion. (*Leon, supra,* 61 Cal.4th at p. 597.)

The trial court reasonably concluded that the theft committed in 2010 shared sufficient common and distinctive features with the charged crime to tend to prove appellant Shelby's identity as the robber. In both cases appellant Shelby worked with another person who enabled him to escape, and took the lead role in each crime. Both crimes took place in Lancaster and involved violence or the threat of violence—in 2010, the victim was beaten by appellant Shelby's co-perpetrator, and here Reyes was robbed at knifepoint. Further, both crimes involved a ruse and the theft of an identical item of property. In 2010, appellant Shelby asked to borrow the victim's phone, then stole it and ran away. Here, Shelby obtained proximity to Reyes, the cash box and phone using the ruse of selling recyclables, then grabbed Reyes' cell phone and ran off.

Considered in its totality, we cannot conclude on this record that the trial court abused its discretion by permitting the jury to consider evidence of the prior crime. While another court could reasonably have ruled otherwise, the requisite "signature" to establish identity does not depend on a showing of uniquely common features between the crimes. Rather, "'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' [Citation.]" (*Leon, supra,* 61 Cal.4th at p. 598.) Further, the similarities between

20

the crimes is a function of the weight afforded the evidence, not its admissibility. (See *People v. Carter, supra,* 36 Cal.4th at p. 1148 ["To be highly distinctive, the charged and uncharged crimes need not be mirror images of each other"; any dissimilarities between the crimes goes to the weight of the evidence and does not preclude the prosecution from introducing the evidence].)

Even where evidence of the prior crime is sufficiently similar to the charged crime to be relevant to prove the defendant's identity, we must also consider whether "'the probative value of the evidence "is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.]"'" (*Leon, supra,* 61 Cal.4th at p. 599.) The prejudice referred to in this context refers to evidence which tends to evoke an emotional bias against the defendant as an individual but has little effect on the issues. "In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 491.) When weighing the probative value versus prejudice to a defendant, the court considers "whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses" (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211), and might lead jurors to punish a defendant for uncharged offenses even if they do not believe he is guilty of the charged offense. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) The court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal absent a showing that it was exercised "'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.)

Despite some dissimilarity between the crimes, we conclude the trial court did not abuse its discretion in admitting the prior crime evidence. Evidence of appellant Shelby's prior crime had a tendency to prove he was also the individual

who committed the robbery here. Particularly so when viewed in conjunction with evidence of the call appellant Shelby made to his brother from Washington's phone just before the robbery, Washington's identification of appellant Shelby as the man who ran away, and the absence of credible alibi evidence. Evidence of the other crime was no more inflammatory than testimony about the charged offense. (*Leon, supra*, 61 Cal.4th at pp. 599-600.) Testimony by the victim's neighbor regarding the 2010 crime was short and straightforward. Also, any prejudicial impact was reduced because appellant Shelby was found to have committed the prior crime. Further, the 2010 crime had sufficient probative value because it was not remote and showed appellant Shelby committed the charged crime in a sufficiently similar manner. (*Ibid*.) Finally, the court's unequivocal instruction about the limited purpose for which the uncharged crime could be considered alleviated any possibility of juror confusion.

Bearing in mind that a trial court's exercise of discretion under Evidence Code section 352 may not be disturbed on appeal absent a showing that such discretion was exercised "'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]'" (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1124–1125), we conclude that the trial court did not err in admitting the evidence of the 2010 crime.[4]

//

//

//

---

[4] Our conclusions that no prosecutorial misconduct occurred, and that the court did not err in admitting the prior crime evidence obviate a need to address the parties' remaining arguments.

## DISPOSITION

The judgment from which appellants Gammage and Shelby have appealed is affirmed.  The petition seeking writ of habeas corpus filed by defendant Gammage is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

23